John K. Landay, Esq. (CA State Bar #257573)
**LANDAY ROBERTS LLP**
600 West Broadway, Suite 700
San Diego, CA 92101
Telephone: (619) 230-5712
**jlanday@landayroberts.com**

ORDERED UNSEALED on 08/24/2026 s/ BreanneC

Oscar M. Price, IV (*pro hac application forthcoming*)
Jacob M. Tubbs (*pro hac application forthcoming*)
T. Graham Cotten (*pro hac application forthcoming*)
**PRICE ARMSTRONG, LLC**
1919 Cahaba Rd.
Birmingham, AL 35223
Phone: 205.208.9588
Fax: 205.208.9598
**oscar@pricearmstrong.com**
**jacob@pricearmstrong.com**
**graham@pricearmstrong.com**

Attorneys for Relator

SEALED

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** *ex rel.* **[under seal]**<br><br>Relator,<br><br>v.<br><br>**[under seal]**<br><br>Defendants. | Case No.: '23CV1404 WQHBLM<br><br>***QUI TAM* COMPLAINT**<br><br>**FILED *IN CAMERA* & UNDER SEAL PURSUANT TO 31 U.S.C. § 3730**<br><br>**NOT FOR PUBLIC DISCLOSURE**<br>**DO NOT PLACE IN PRESS BOX**<br>**DO NOT ENTER ON PACER** |

John K. Landay, Esq. (CA State Bar #257573)
**LANDAY ROBERTS LLP**
600 West Broadway, Suite 700
San Diego, CA 92101
Telephone: (619) 230-5712
Email: jlanday@landayroberts.com

Oscar M. Price, IV (*pro hac application forthcoming*)
Jacob M. Tubbs (*pro hac application forthcoming*)
T. Graham Cotten (*pro hac application forthcoming*)
**PRICE ARMSTRONG, LLC**
1919 Cahaba Rd.
Birmingham, AL 35223
Phone: 205.208.9588
Fax: 205.208.9598
**oscar@pricearmstrong.com**
**jacob@pricearmstrong.com**
**graham@pricearmstrong.com**

Attorneys for Relator

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** *ex rel.* **KIM LUONG,**<br><br>Relator,<br><br>v.<br><br>**DERMTECH, INC.; DERMTECH OPERATIONS, INC.; SARAH ORR; CLAUDIA IBARRA; GENI CONSTANTINO; KELLIE HILL,**<br><br>Defendants. | Case No.:<br><br>***QUI TAM* COMPLAINT**<br><br>**FILED *IN CAMERA* & UNDER SEAL PURSUANT TO 31 U.S.C. § 3730**<br><br>**NOT FOR PUBLIC DISCLOSURE**<br>**DO NOT PLACE IN PRESS BOX**<br>**DO NOT ENTER ON PACER** |

# *QUI TAM* COMPLAINT

## Introduction

1. DermTech's Melanoma Test is a "rule-out" test for skin cancer. According to DermTech, if your Melanoma Test comes back negative, there is a 99% chance that you do not have skin cancer.

2. More than 150,000 people have discovered a suspicious area on their skin, sent a skin sample to DermTech, and received a test result. People who received back a positive result have undergone invasive testing or surgery. People who received back a negative result have ruled out cancer.

3. About half of those people were on Medicare, which paid for their DermTech Melanoma Tests. Each test cost $760.

4. Most of those people received valid test results.

5. But many people—thousands of Medicare patients—did not. What those people received was a result for a DermTech Melanoma Test that purported to rule out (or rule in) skin cancer, but in reality had never been performed.

6. In reality, their sample had been in a test batch that had failed. Each week in DermTech's laboratory, about three to four batches failed. Each of those batches contained 85 patient samples.

7. Some of those patients had skin cancer, but were told that they did not.

8. When Relator Kim Luong discovered that her lab supervisor and some of her fellow lab scientists at DermTech were doctoring failed test results and sending those results out to patients—and had been for years—she refused to participate in the scheme. In March of 2023, Ms. Luong reported DermTech to its accreditation organization (the College of American Pathologists), which opened an investigation. After CAP showed up at DermTech's lab for a surprise inspection in May, DermTech suspected that Ms. Luong and a colleague had instigating the investigation and terminated their employment. Ms. Luong was accused of "gossiping" and failing to fall in line with DermTech's "culture."

9. DermTech generated more than ten million dollars in annual revenue in 2021 and 2022. Its test revenue in the first quarter of 2023 alone exceeded $3,000,000.

10. This is a *qui tam* case brought under the False Claims Act to recover money paid by Medicare to DermTech on fraudulent claims for payment submitted by DermTech for laboratory tests. DermTech deliberately charged for laboratory tests that it knew it had not performed. DermTech broke federal laws for Medicare reimbursement and submitted millions of dollars in false claims for payment to Medicare. In the course of its conduct, DermTech also misled countless patients and health providers with misleading, invalid test results.

## Jurisdiction and Venue

11. This action arises under the False Claims Act, 31 U.S.C. §§ 3729-33 (the "False Claims Act"). Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1331. Jurisdiction is also authorized under 31 U.S.C. § 3732(a). The acts proscribed by 31 USC § 3729(a) and described in this qui tam complaint occurred in the Southern District of California and elsewhere in the United States.

12. Venue lies in this judicial district under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b), (c), because Defendants are based in La Jolla, are qualified to do business in the state of California, transact substantial business in the state of California, transact substantial business in this judicial district, and can be found here. Additionally, and as described herein, Defendants committed acts proscribed by 31 U.S.C. § 3729 within this judicial district. Specifically, Defendants submitted and caused to be submitted within this judicial district false claims to Medicare and Medicaid and other government payors for payment of laboratory test procedures and submitted or used false records material to make such claims.

## Parties

13. DermTech, Inc. is a Delaware corporation with its principal place of business in San Diego, California. DermTech Operations Inc. is a subsidiary of DermTech, Inc. and is a Delaware corporation with its principal place of business in La Jolla, CA. Both are registered to do business in the state of California and have

many of the same corporate agents listed on their registration. The precise corporate structure of DermTech, Inc. and its subsidiary is presently unknown to the relator, and the companies are referred to collectively as "DermTech."

14. According to its SEC filings, DermTech "is a molecular diagnostic company developing and marketing novel non-invasive genomics tests to aid in the diagnosis and management of skin cancer, inflammatory skin diseases, and aging-related skin conditions."

15. Defendant Claudia Ibarra is a California resident and DermTech's chief operating officer.

16. Defendant Sarah Orr is a California resident and the senior director of laboratory operations at DermTech.

17. Defendant Kellie Hill is a California resident and the director of laboratory operations at DermTech.

18. Defendant Geni Constantino is a California resident and a clinical lab scientist at DermTech. Ms. Constantino supervised Ms. Luong and her colleagues.

19. Relator Kim Luong was a clinical lab scientist at DermTech from June 2022 to May 2023. Ms. Luong earned a bachelor's of science in Medical Laboratory Science in 2019. Before DermTech, Ms. Luong worked at two healthcare companies.

**Background: Medicare and the False Claims Act**

20. Medicare is a federal health insurance program for the elderly and people with disabilities. *See* 42 U.S.C. § 1395c. Medicare Part B provides outpatient coverage for, among other things, diagnostic laboratory tests. *See* 42 C.F.R. § 410.32. Federal regulations impose "conditions that all laboratories must meet to be certified to perform testing on human specimens under the Clinical Laboratory Improvement Amendments of 1988 (CLIA)," which conditions "are the same for Medicare approval as for CLIA certification." Id. § 493.1.

21. Federal regulations classify the kind of testing that DermTech performed as "high complexity." See, e.g., id. § 493.25. Those tests require approval from HHS. *See, e.g., id.* §§ 493.49, 493.57, 493.801. A key requirement of testing approval is that "a laboratory must establish and maintain the accuracy of its testing procedures." *Id.* § 493.801. And "[t]he laboratory must establish and follow written policies and procedures that ensure positive identification and optimum integrity of a patient's specimen from the time of collection or receipt of the specimen through completion of testing and reporting of results." *Id.* § 493.1232.

22. The most important policy is a laboratory's standard operating procedure (SOP). Id. § 493.1251. The SOP "must be . . . followed by[] laboratory personnel," and "must include," inter alia, "detection of inadequately prepared slides," "[t]he reportable range for test results for the test system as established or

verified," "[c]ontrol procedures," and "[c]orrective action to take when . . . control results fail." Id.

23. Further, "[t]he laboratory must have an adequate manual or electronic system(s) in place to ensure test results and other patient-specific data are accurately and reliably sent from the point of data entry (whether interfaced or entered manually) to final report destination[.]" Id. § 493.1291.

24. Testing approval also imposes an ongoing notification requirement on laboratories. *See, e.g., id.* §§ 493.51, 493.63.

25. Compliance with those regulations is material to reimbursement by Medicare—indeed, it is crucial to patient safety.

26. Section 3729(a)(1)(A) of the False Claims Act imposes liability for "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). Section 3729(a)(1)(B) imposes liability on "any person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." Id. § 3729(a)(1)(B).

27. The False Claims Act also imposes liability for so-called worthless services; that is, healthcare services that are so poorly delivered as to amount to no services at all. *See, e.g., Hagood v. Sonoma County Water Agency*, 81 F.3d 1465 (9th Cir. 1996); *United States v. Houser*, 754 F.3d 1335 (11th Cir. 2014);

*Chesbrough v. VPA, P.C.*, 655 F.3d 461 (6th Cir.2011); *Mikes v. Straus*, 274 F.3d 687 (2d Cir. 2001).

28. CMS regulates all diagnostic laboratories like DermTech through the regulations contained in the Clinical Laboratory Improvement Amendments (CLIA). Compliance with CLIA regulations is a material pre-requisite to obtaining Medicare or Medicaid reimbursement. *See, e.g.,* 42 C.F.R. §§ 493.1250 et seq.; *see also id.* §§ 493.1282, 493.1291, 493.63, 493.801, 493.1808, 493.1809; 63 Fed. Reg. 45081 (August 24, 1998).

**Background: DermTech**

29. DermTech is a diagnostic testing laboratory that described itself in a 2021 investor prospectus thus: "DermTech is a leading genomics company in dermatology and is creating a new category of medicine, precision dermatology, enabled by our non-invasive skin genomics platform. . . . DermTech provides genomic analysis of skin samples collected non-invasively using an adhesive patch rather than a scalpel. DermTech markets and develops products that facilitate the early detection of skin cancers."

30. Basically, patients send in a skin sample over a suspicious area of skin to DermTech, and five days later, DermTech tells the patient whether or not they have skin cancer. The idea is that a negative test result almost certainly means that no further testing is required (it "rules out" melanoma).

31. DermTech markets its DermTech Melanoma Test ("DMT") "directly to dermatologists in the United States with a team of approximately 70 sales representatives."

32. DermTech launched the DMT in 2016 and released a new iteration of its DMT in 2021.

33. DermTech's current laboratory, where Ms. Luong worked, can "handle approximately 150,000 DMT tests per year." DermTech estimates that its "new laboratory facility in San Diego, California . . . should be able to scale to over 1,000,000 tests per year," and it "expect[s] to transition commercial laboratory operations to the new facility in the first half of 2023."

34. In 2022, DermTech had approximately 278 full-time employees, including "17 in clinical operations, . . . 36 in laboratory operations, and 118 in sales and marketing."

35. In 2021, DermTech processed 44,650 billable samples and generated $11,000,000 in test revenue. Put differently, in 2021, DermTech performed nearly 45,000 DMT tests for which it billed payors (such as Medicare) $760 per test. **In 2022, DermTech processed 68,230 billable samples** and generated $13.8 million in test revenue.

36. In a 2021 investor prospectus, DermTech estimated that about half of the revenue for the kinds of testing it performs comes from Medicare patients, for whom the test is free (Medicare foots the bill).

**37. Using DermTech's own estimates, it can reasonably be inferred that Medicare paid DermTech more than $5,000,000 per year in 2021 and 2022 to perform its DMT tests.**

38. DermTech explained to potential investors that Medicare is its primary generator potential growth. This chart comes from DermTech's literature:




39. According to DermTech, its DMT test is superior to traditional melanoma tests for three main reasons: it is more accurate (99% vs. ~ 90%), it is

non-invasive (it is like peeling off a Band-Aid vs. having skin scrapped off by a scalpel), and it delivers results quickly (five days vs. two weeks).

**Doctored DMT Test Results**

40. Relator Luong was one of the many lab scientists who performed DermTech Melanoma Tests in 2022 and 2023.

41. Claudia Ibarra is DermTech's chief operating officer. Sarah Orr is the senior director of laboratory operations at DermTech, and Kellie Hill is the director of laboratory operations. Geni Constantino is a clinical lab scientist at DermTech and supervised Ms. Luong and her colleagues.

42. Every day, DermTech runs DermTech Melanoma Tests on about 300 patient samples.

43. The allegations in the following paragraphs 44-48 describe DermTech Standard Operating Procedure. *See supra* ¶ 22.

44. DMTs are run in batches using a 96-well testing plate. In those wells are 85 patient samples are three controls (the other eight wells remain empty). There is (1) a positive control (which ensures that the test can identify positive patient samples (patients who have skin cancer)); (2) a negative control (which ensures that the test can identify negative patient samples); and (3) an NTC (a clean control that ensures that the test plate has not been contaminated).

45. In the first stage of the test, the test plate is inserted in a machine (the Hamilton) that distributes the patient samples and the three controls into the appropriate wells. Basically, the first stage prepares the plate for testing.

46. In the second stage of the test, the test plate is inserted in a second machine (the Quantstudio). This is the quantification stage, in which the premise amount of RNA concentration is in each sample/control is determined. In this stage, the test plate is analyzed to ensure that (1) the positive controls shows up positive; (2) the negative control shows up negative; and (3) the clean control shows up clean. If the clean control (NTC) shows "amplification" (i.e., value), the result will read: "NTC contamination."

47. The second (quality control) stage is a one-shot stage; it cannot be rerun.

48. In the third stage, the patient samples are analyzed against the controls to render positive and negative test results. But if the test plate failed during the quality control, the result of the test is that the test failed.

49. The machine that performs the quality control stage keeps an electronic log of results. That results log is difficult to tamper with virtually. In other words, it is not easy for a lab scientist to open the results file on the computer and alter the results for a particular well. The software does not allow that.

50. But what DermTech scientists discovered years ago is this: it is relatively easy to tamper with the plate template and results log *manually*. In other words, the machine software can be tricked by opening the test plate up and physically adding or swapping a control. In DermTech speak, this practice is called adding or swapping a control "offline": the new control can be hidden.

51. The newly added or swapped control does not perform any scientific function. It does not enable the test to be performed again. A test plate that failed quality control cannot be rescued.

52. What the added/swapped control does is allow a lab scientist to alter the results log of the failed test. That added control (which is a control that has already passed in a test of a different test plate) appears to the computer *as if* it were the control that was used during the quality control stage of the failed test plate. The scientist can then run the third stage as if the test had not failed, force the computer to generate what appear to be valid test results, and bill $64,600 ($760x85) for that test.

53. To illustrate what DermTech's scientists are doing, consider a software program that logs whether a driver is wearing her seatbelt. The program works by detecting whether the metal clip has been inserted into the driver's side seat belt buckle. Now consider a car in which the driver's seatbelt has been removed. To avoid failing the seatbelt test, the driver takes the metal clip from the passenger's

seatbelt and plugs it in the driver's seatbelt buckle. On the log, it appears that the driver is wearing a seatbelt. In reality, she is not. She has manually tricked the software into generating the result that she wanted.

54. Each week, approximately three to four DMT test plates fail quality control. Put differently, each week, about 300 patient samples fail the DermTech Melanoma Test. DermTech never reports these failures. Instead, DermTech reports the results of its doctored test and bills Medicare for those tests.

55. For example, on batches run on August 25, September 11, and September 12, 2022, controls were contaminated and the test batches failed. Yet those tests were reported out as accurate and DermTech billed those tests to patients, around half of whom were on Medicare. **Put differently, on just three days in August and September 2022, DermTech billed Medicare approximately $100,000 for worthless tests.**

56. For a fourth, fifth, sixth, seventh, and eighth example: plate 1 (PLT115145) on November 22, 2022; and Batch 2 on December 30, 2022; and batches DT116022 and DT 116023 on March 23, 2023, all failed quality control, but the results were reported out as accurate and DermTech received payment for those tests.

57. Those eight test batches are just the examples of fraudulent billing that Ms. Luong has records of. But Ms. Luong was one of thirty-six lab scientists, and

has records of only a small subset of the true number of fraudulent, worthless tests for which DermTech was reimbursed by Medicare.

58. DermTech knew about theses batch failures and instructed its employees to hide the failure.

59. For example, on March 13, 2023, Director Hill sent an email to lab technicians reminding them that if a control "is showing any beta-actin quantification values" (*i.e.*, reporting that the test plate failed quality control), "throw on another one from norm onwards" (*i.e.*, add a control that can be used to generate a passing quality control result).

60. For another example, on December 28, 2022, a DermTech employee sent Ms. Constantino (DermTech's lab supervisor) an email informing her that there were control contaminations on two of the three test plates and that additional controls were added onto those plates. Ms. Constantino responded by praising the result and thanking the employee.

61. On January 26, 2023, Ms. Constantino sent an email to employees stating: "Please remember to add an extra (offline) HTB to plate [redacted] will help you." The parenthetical "(offline)" is a reference to the fact that the employee should suppress the added control on the batch documentation, because otherwise it would be apparent that the test batch was invalid and DermTech could not receive payment on those tests.

62. Similar emails reporting the addition of controls onto test batches were sent by or to Ms. Constantino on December 12th, 27th, and 29th, 2022; January 3rd, 13th, and 17th, 2023; and February 6th and 13th, 2023. Each of those emails involved one or more failed test batches that were doctored to appear to render valid results.

63. Later in 2023, a lab employee reported to Ms. Constantino that vials of patient samples had been dropped and that the vials no longer contained enough sample to be analyzed. Days later, the lab employee discovered that Ms. Constantino had tested the worthless samples anyway and reported out them as "negative." When the lab employee questioned Ms. Constantino about the incident, Ms. Constantino referred the employee to Director Hill.

**CLIA Lab Certification**

64. DermTech's most obvious violation of the False Claims Act was its routine failure to perform the clinical tests that it billed for. DermTech's fraudulent practices also violated many of the regulations cited supra, compliance with which is a material to accreditation and reimbursement by Medicare.

65. A diagnostic testing laboratory's essential purpose is to produce scientifically valid and reliable results. "The ability of a laboratory test to consistently produce accurate and precise results is not only essential, it is the core

of quality assurance programs for clinical laboratories."[1] To do so in the context of high-complexity testing like that performed by DermTech, rigorous scientific controls are required. Because DermTech routinely manipulated those controls, thousands of the patient tests it performed were worthless.

66. DermTech obtained its CLIA lab certification by deliberately concealing information about its testing practices, and its ongoing testing operations consistently evaded those regulations.

67. DermTech used invalid laboratory controls, failed to enforce essential laboratory practices in the process of its testing operations, and intentionally concealed this information in patient testing records that federal regulations required it to keep.

68. DermTech's poor quality controls often failed the most basic scientific functions, such as properly testing laboratory controls – the most basic element of any diagnostic laboratory test.

69. Under CLIA, a diagnostic laboratory like DermTech is required to run controls on its diagnostic tests, to ensure that its testing machines are calibrated properly, and to ensure that its testing mechanisms are detecting something with accuracy. *See* 42 CFR §493.1256(a), (c):

[1] Espy, M.J., Real-Time PCR in Clinical Microbiology: Applications for Routine Laboratory Testing, Clinical Microbiology Reviews Jan 2006, 19 (1) 165-256.

> (a) For each test system, the laboratory is responsible for having control procedures that monitor the accuracy and precision of the complete analytic process. . . .
> (c) The control procedures must -
>
> (1) Detect immediate errors that occur due to test system failure, adverse environmental conditions, and operator performance.
>
> (3) At least once each day patient specimens are assayed or examined perform the following for— (i) Each quantitative procedure, include two control materials of different concentrations.

70. Without controls, a "negative" test result is scientifically meaningless, as it is merely the result of a failed test.

71. DermTech consistently and routinely reported results for tests it knew had failed, charged patients, and obtained payment for them.

72. Healthcare providers used these failed test results in the treatment of patients. DermTech's practice of reporting of false positives resulted in patients needlessly worrying that they likely had skin cancer, and its reporting of false negatives could well have led to healthcare providers withholding necessary treatments or further testing for melanoma. And Medicare paid DermTech for those failed tests.

**DermTech's Manipulation of Test Ranges**

73. Control manipulation is one way that DermTech fraudulently increases the number of tests that it can bill for; the other way is range manipulation.

74. In diagnostic testing, lab scientists rely on "ranges" that distinguish a valid test result from an invalid outlier. Those ranges must be supported by evidence that is summarized in a "validation report." Only tests that fall within that range are valid. Any changes to that range must also be supported by evidence and a validation report.

75. The valid LINC range for DMT Tests is CT between 5 and 35 (with an HTB positive control). That range is supported by evidence and summarized in a validation report.

76. Around October of 2022, DermTech expanded the LINC range to between 5 and 40 (with a corresponding ACTB reference gene with a Ct between 25.24 and 40). That expansion made more tests fall into the valid range, which meant that DermTech could generate more revenue (by billing for tests that in reality were falling outside its validated testing range and therefore invalid). The expansion was not supported by a validation report.

77. Ms. Luong estimates that by impermissibly expanding the range limit from 35 to 40, DermTech was able to capture between approximately 85 and 300 additional tests per week, resulting in tens and hundreds of thousands of dollars in additional reimbursement for worthless tests each week.

78. After CAP inspected DermTech, DermTech changed the range back to the values supported by the validation report.

**Ms. Luong Tried to Stop the Fraud; DermTech Refused & Punished Her**

79. In March of 2023, Ms. Luong informed her colleagues that DermTech's practices regarding control contamination and range manipulation were unlawful and jeopardized patient trust and health. Ms. Luong was upset in particular about the fact that DermTech was reporting false positives to patients (who then needlessly worried that they had skin cancer) and reporting false negatives to patients who should have been reported positive (endangering their lives).

80. In March, April, and May of 2023, Ms. Luong submitted confidential complaints about DermTech's practices to CAP, the California Department of Public Health (CDPH), the United States Department of Health and Human Services (HHS), and the Centers for Medicare and Medicaid Services (CMS).

81. Ms. Luong's colleagues (Mr. Samouna and Ms. Rosario) aided her and investigators in submitting information.

82. CAP opened an investigation and performed a surprise inspection of DermTech's lab on April 28, 2023.

83. Shortly thereafter, DermTech told Ms. Luong that she was not conforming to DermTech's "culture" (of deviating from valid testing procedures and doctoring test results), accused her of "gossiping" (raising those concerns with her colleagues), and terminated her employment. It is reasonable to infer that DermTech

discovered that Ms. Luong had caused DermTech to come under investigation and retaliated.

84. Shortly thereafter, DermTech also terminated Ms. Luong's colleague's employment.

**COUNT ONE**
**PRESENTING OR CAUSING TO BE PRESENTED FALSE CLAIMS UNDER 31 U.S.C. § 3729**

85. Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

86. Defendants violated the federal False Claims Act by submitting claims, or causing the submission of claims, for reimbursement from federal health care programs, including Medicare, knowing that they were ineligible for the payments demanded.

87. Claims submitted, or that were caused to be submitted, by the DermTech for clinical laboratory testing services that were not appropriately provided or were useless constitute violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

88. Defendants knowingly caused to be made or used false records or statements, material to false claims, including, but not limited to:

a. false records reflecting laboratory tests that DermTech did not perform;

b. false records reflecting definitive results of laboratory tests that were not reliable;

c. false submissions for payment to the United States of America for services that were not performed or were otherwise worthless; and

d. false records of DermTech's laboratory capabilities and procedures.

89. The United States paid the false claims described herein.

90. Defendants' fraudulent actions, as described *supra*, are part of a widespread, systematic pattern and practice of knowingly submitting or causing to be submitted false claims to the United States.

91. Defendants' fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to DermTech and others by the United States through Medicare for such false or fraudulent claims.

WHEREFORE, Relator demands judgment in her favor on behalf of the United States, and against Defendants, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relator may be entitled.

**COUNT TWO**
**MAKING OR USING FALSE STATEMENTS OR RECORDS MATERIAL TO A FALSE CLAIM UNDER 31 U.S.C. § 3729**

92. Relator adopts and incorporates the previous paragraphs (except those in Count One) as though fully set forth herein.

93. By and through the fraudulent schemes described herein, Defendants knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim or to get a false or fraudulent claim paid or approved by the United States as follows:

a. Defendants created and used false certifications and records intended to support its fraudulent billing to the United States, all in violation of 42 U.S.C. §1395y and the Medicare regulations cited *supra*.

b. Defendants made false certifications regarding past, present, or future compliance with a prerequisite for payment or reimbursement by the United States through Medicare or Medicaid, including false certifications on CMS Form 116, when Defendants were aware that their practices as described herein were in violation of Medicare payment prerequisites, including but not limited to 42 U.S.C. §1395y and the applicable Local Coverage Determinations.

94. The false records or statements described herein were material to the false claims submitted, or caused to be submitted, by Defendants to the United States.

95. In reliance upon Defendants' false statements and records, the United States paid false claims that it would not have paid if not for those false statements and records.

96. Defendants' fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to DermTech by the United States for such false or fraudulent claims.

WHEREFORE, Relator demands judgment in her favor on behalf of the United States, and against Defendants, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relator may be entitled.

## COUNT THREE
## "REVERSE FALSE CLAIMS" UNDER 31 U.S.C. § 3729(a)(1)(G)

97. Relator adopts and incorporates the previous paragraphs (except those in previous counts) as though fully set forth herein.

98. By and through the fraudulent schemes described herein, Defendants knowingly – by actual knowledge or in deliberate ignorance or with reckless

disregard of the truth or falsity of the information – made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the United States, or knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money or property to the United States:

(a) Defendants knew DermTech had received payments for laboratory tests that were invalid and worthless yet Defendants took no action to satisfy its obligations to the United States to repay or refund those payments and instead retained the fund and continued to bill the United States;

(b) Defendants knew that DermTech had received payments for laboratory tests that were not performed, yet Defendants took no action to satisfy their obligations to the United Sates to repay or refund those payments and instead retained the funds and continued to bill the United States;

99. As a result of Defendants' fraudulent conduct, the United States has suffered damage in the amount of funds that belong to the United States but are improperly retained by DermTech.

WHEREFORE, Relator demands judgment in her favor on behalf of the United States, and against Defendants, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as

permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relator may be entitled.

**COUNT FOUR**
**CONSPIRACY UNDER 31 U.S.C. § 3729(a)(3)**

100. Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

101. Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the United States for payment or approval as follows: DermTech knew that it was reporting invalid tests for which it presented false claims to the United States through Medicare for payment of same.

102. The United States paid DermTech for such false claims.

103. DermTech, in concert with the individual Defendants, agreed to submit such false claims to the United States.

104. DermTech and the individual Defendants, by and through the conduct described *supra*, with the intent to defraud the United States by submitting false claims for payment to the United States through Medicare.

105. Defendants' fraudulent actions, together with the fraudulent actions of DermTech's principals, agents and employees, have resulted in damage to the United States equal to the amount paid by the United States to DermTech and others as a result of Defendants' fraudulent claims.

WHEREFORE, Relator demands judgment in her favor on behalf of the United States and against Defendants, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees, costs, interest, and such other, different, or further relief to which Relator may be entitled.

Dated: July 31, 2023

/s John K. Landay
John K. Landay (Cal. Bar #257573)
**Landay Roberts LLP**
600 W. Broadway, Suite 700
San Diego, CA 92101
Phone: (619) 230-5712
**jlanday@landayroberts.com**
*Attorneys for Relator Kim Luong*

Dated: July 31, 2023

/s Jacob M. Tubbs
Oscar M. Price, IV (*pro hac application forthcoming*)
Jacob M. Tubbs (*pro hac application forthcoming*)
T. Graham Cotten (*pro hac application forthcoming*)
**PRICE ARMSTRONG, LLC**
1919 Cahaba Rd.
Birmingham, AL 35223
Phone: 205.208.9588
Fax: 205.208.9598
**oscar@pricearmstrong.com**
**jacob@pricearmstrong.com**
**graham@pricearmstrong.com**
*Attorneys for Relator Kim Luong*